IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>4 POINTS TOWING & ROADSIDE SERVICE LLC,<br><br>           Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case No. _____ |

**DECLARATION OF JANET KOPE**
**IN SUPPORT OF FIRST-DAY PLEADINGS**

Janet Kope, the managing member of 4 Points Towing & Roadside Service LLC (the "Debtor"), debtor and debtor in possession in the above-captioned case, makes this declaration in accordance with 28 U.S.C. § 1746:

1. The Debtor has filed various motions and applications in this case, and this declaration is executed to provide factual support to support them. The statements made in this declaration are made upon personal knowledge, except where expressly indicated otherwise, and upon my inspection of certain books and records of the Debtor.

2. I am writing declaration to provide a factual background to the Court and the parties to establish a context and explanation of the Debtor and its financial affairs. Second, I will provide factual support for specific individual motions and applications filed by the Debtor.

I. **BACKGROUND.**

3. On August 8, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has managed its affairs as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4. The Debtor is a family owned and operated local towing company that provides towing service to Kent County and all surrounding areas in Delaware and Maryland, focusing on local and long distance towing for cars and trucks, exotic and classic cars, and low clearance vehicle towing. It also performs light equipment hauling in Dover and on US-13 & DE-1 in Harrington, Milford, and Central Delaware. I am the Debtor's 100% owner and sole managing member, and my husband Paul Kope is the Director of Operations. We have served in these roles since the Debtor's inception in 2017.

5. I also own and manage a non-debtor affiliate of the Debtor called 4 Points Automotive, LLC ("4 Points Auto"), an auto repair and maintenance for cars and trucks formed in 2021 and located in Camden, Delaware. Except for co-obligation with the Debtor's debt to one creditor, 4 Points Auto operates independently of the Debtor, uses different employees than the Debtor, performs different services than the Debtor, and is not entangled with the Debtor.

6. The Debtor was relatively profitable for several years but ran into financial trouble arising from three specific events. First, one impact of the COVID

epidemic was the reduction of tourism in the beach areas of Sussex County, which severely reduced the Debtor's summer business for four seasons. This unexpected loss of income prevented the Debtor from being able to make its payments to many of its creditors, creating defaults in some instances and forcing the Debtor to borrow from high-interest, aggressive merchant cash advance companies to meet its expenses.

7. Second, the Debtor attempted to expand into a different market in Delmar, which turned out to be disastrous. Despite the efforts of the Director of Operations to break into that market, the Debtor was unable to secure sufficient business to meet its expenses in that location. Moreover, because my and my husband's supervision was spread thin by having two locations over an hour apart, the Debtor suffered theft of cash and inventory, further widening the financial distress.

8. Third, as noted above, the Debtor was forced to turn to high-interest merchant cash advances to meet its short-term expenses, which snow-balled the Debtor's financial collapse. Those lenders charged very high interest rates, took funds directly out of the Debtor's bank accounts on a weekly basis to repay themselves, and commenced expensive, time-consuming litigation outside of Delaware to obtain judgments against the Debtor. This resulted not just in judgments far exceeding the amounts borrowed but also cost the Debtor substantial attorneys' fees to defend. They also pursued an aggressive discovery strategy,

threatening to contact the Debtor's customers to redirect payments in satisfaction of their judgments. It soon became clear that the Debtor could not conduct its business without relief from them.

9. Moreover, in order to acquire the Delmar property through a special purpose LLC for the Debtor and 4 Points Auto to operate in, I caused the Debtor, 4 Points Auto, myself, and my husband to sign personal guaranties of the property loan, in the face amount of $1.8 million. When we were unable to make the payments required under that loan, it went into foreclosure and sold for a fraction of its fair market value at Sheriff's sale on or about April 15, 2025, when it was bought back by the lender, Newtek Small Business Finance, LLC ("Newtek"). Even after the sale of this very valuable property, the amount still owed to Newtek for the mortgage debt is (allegedly) approximately $1.2 million, which the Debtor believes may be secured by most of the remaining vehicles and a blanket lien on all of the Debtor's assets. This is in addition to the loans that were taken solely for the vehicles. Upon information and belief, the Debtor's assets are worth far less than Newtek's debt.

10. In order to expand its operations, the Debtor had acquired several additional tow trucks, bringing its fleet to 11 vehicles. Once the Delmar location closed, the Debtor's driver base shrank to only 3 full-time drivers (including my husband), and one part-time driver. The Debtor's operation at its remaining

location remains more brisk at the moment, but the Debtor needs to retain only 3 of its 11 vehicles.

11. As of the Petition Date, the Debtor's books and records indicate that it owes approximately $1.2 million in secured debts to Newtek, with collateral securing those claims being much less.[1] Given that the value of Newtek's collateral is substantially less than the amount of its asserted claims, I believe that a large part of Newtek's claims against the Debtor will be treated as unsecured. I have reviewed a search of UCC-1 financing statements for the Debtor and determined that all of Newtek's UCC-1 financing statements were recorded before the financing statements of other creditors. Therefore, with the possible exception of purchase money security interests asserted on specific assets, I believe that other creditors asserting liens on the Debtor's assets will have no equity in those assets and will be treated in this case as unsecured. The total known debts asserted against the Debtor besides Newtek's claims total approximately $1.2 million according to the Debtor's books and records.

12. Due to the extremely high personal guaranty liabilities, actual and threatened, my husband and I were forced to file our own Chapter 13 case. That case is pending.

---

[1] The information in this declaration are provided for general information only and should not be deemed an admission of the validity, priority, or amount of any claims and any liens securing such claims.

13. I have reviewed the finances of the Debtor and determined that, without the legacy debts of Newtek and the merchant cash advance creditors, the Debtor is capable of operating profitably with a smaller fleet. With relief from this Court, I believe that the Debtor can accomplish this objective by the filing and confirmation of a plan in this case.

14. As noted above, I own 4 Points Auto, an auto repair and maintenance shop for cars and trucks formed in 2021 and located in Camden, Delaware. Although I own and manage 4 Points Auto, that entity operates independently of the Debtor, uses different employees than the Debtor, performs different services than the Debtor, and is generally not entangled with the Debtor. With only a few minor exceptions, 4 Points Auto has kept its assets, creditors, bank accounts, and contracts independent of the Debtor since the inception of both entities.

15. 4 Points Auto does not share most creditors with the Debtor (other than Newtek) and upon information and belief operates at a modest profit. In the hopes of reaching a resolution with Newtek through a consensual Chapter 11 plan by the Debtor, 4 Points Auto has not filed its own Chapter 11 petition at this time. In the event that Newtek does not support a Chapter 11 plan by the Debtor, it may become necessary for 4 Points Auto to file its own petition.

## II. FACTS IN SUPPORT OF SPECIFIC FIRST-DAY PLEADINGS.

16. The following sections contain facts intended to provide a record for certain motions filed at the beginning of this case.

### A. Motion To Use Cash Collateral.

17. On the Petition Date, the Debtor may have had, and may also acquire, property of the estate in which numerous secured creditors (the "Secured Parties") may assert an interest ("Collateral"), including but not limited to certain of its cash ("Cash Collateral").

18. During this case, I believe the Debtor will need to use the Collateral to generate income for the estate, including but not limited to its Cash Collateral. Absent the use of Cash Collateral, the Debtor will not be able to protect the Collateral, and its estate, and its creditors will suffer immediate and irreparable harm. To obtain approval of the use of Cash Collateral, the Debtor has filed a Motion For Entry Of Interim and Final Orders Approving Use Of Cash Collateral and Providing For Adequate Protection of Creditor's Interest in Collateral (the "Cash Collateral Motion")

19. As noted above, the Debtor's senior secured creditor appears to be Newtek, whose original claims totaling more than $2 million arise from three

loans, at least one of which is secured by a blank lien on substantially all of the Debtor's assets.[2]

20.     Among the three loans from Newtek, one of them required a regular monthly mortgage payment in the amount of approximately $20,000. That loan went into default, and the real property securing that loan (the above-described Delmar property) was sold at foreclosure back to Newtek. While an estimated $1.2 million remains unpaid on that loan, there may be no collateral securing it, so I do not believe there is any collateral requiring "protection" in connection with that loan.

21.     Regarding the two vehicle loans, the Debtor's regular monthly vehicle payments to Newtek under the applicable loan documents total approximately $10,000. However, the Debtor has returned, or will immediately be returning, 8 vehicles that serve(d) as collateral and will be keeping only 3 vehicles.[3] Although Newtek's claims appear to be secured by a blanket lien, the only collateral securing these claims are the 3 retained vehicles and the Debtor's cash.

22.     I do not believe that it should be necessary for the Debtor to make any payments to Newtek to protect its interest in 3 vehicles and cash, because I am hopeful that the Debtor's interest in cash will increase faster than the value of the

---

[2] The Debtor's assets may include approximately two shop assets subject to purchase money security interests that may be senior to Newtek's blanket lien. These assets are used by 4 Points Auto and paid by that entity.
[3] The lender secured by one of these vehicles is First Business Bank, not Newtek. The Debtor is making arrangements for the return of that vehicle as well.

retained vehicles will diminish. However, in good faith, I have proposed that the Debtor can make regular monthly payments to Newtek in the amount of $2,264.55 as adequate protection.

23. The Debtor requires the use of cash to meet its expenses and fund its operations during this case. It has proposed a budget for the use of its cash during the first three months of this case, which is attached to the Cash Collateral Motion as Exhibit A-1 (the "Budget"). The Budget was prepared by me and under my supervision, and I reasonably believe that it approximates the Debtor's revenues and expenses during that period, subject to a 15% variance.

24. Subject to validation of Newtek's liens, I believe that the Court would likely find that its cash will be treated as Cash Collateral. Aside from actual cash in the Debtor's bank account on the Petition Date, I am told that any revenues may be the proceeds of accounts, which are expressly listed in Newtek's UCC-1 financing statement. The primary uses of Cash Collateral will be to meet the Debtor's operational expenses such as wages, fuel, and insurance, and to pay the bankruptcy administrative expenses such as professional fees and fees payable to the Subchapter V trustee.

25. The inability of the Debtor to use Cash Collateral would have an immediate and materially adverse effect on its estate and creditors. The ability of the Debtor to remain a viable entity and to reorganize under Chapter 11 of the Bankruptcy Code therefore depends upon obtaining the relief requested herein.

26. The Debtor's use of Cash Collateral will also protect Newtek's other Collateral. The purpose of this bankruptcy is to create sufficient liquidity to keep the Debtor's vehicles on the road, leading to further sales. This directly inures to Newtek's benefit.

27. According to my Debtor's best estimate (although subject to verification), Newtek's claim is approximately $1.9 million, while the value of the Debtor's assets is substantially less. Therefore, Newtek is undersecured. No junior secured creditor—even if its claim were otherwise valid and perfected—would hold any equity in the Debtor's assets.

28. Because it is no longer necessary for the Debtor to meet its debt service obligations to its prepetition creditors, the Debtor will be able it to use its cash for ongoing operations. Without the necessity of meeting debt service, I hope the Debtor will at least break while a plan can be formulated and filed. Therefore, the Debtor projects that the value of its assets will not diminish as it makes more sales and generates more cash.

29. It should also be noted that the Debtor is still studying the claims of Newtek to determine whether they are valid, validly secured, validly perfected, and/or subject to other defenses and setoffs. The documents underlying those claims may be complex.

30. On the other hand, I believe that no other allegedly Secured Parties are entitled to protection at this time. Due to the fact that Newtek's secured claim

may be over $2 million but the Debtor's assets are worth less than $200,000, I believe that the claims of any junior secured creditors are totally unsecured.

31. The Debtor would suffer immediate and irreparable harm if it is not permitted to use its Cash Collateral on an interim basis. It relies on its ongoing use of cash collateral to operate its business. Its most important priority is to ensure that operational expenses are met in the ordinary course of business, such as payroll and related expenses, vehicle expenses such as maintenance and fuel, and insurance. Even a delay of a couple days severely and adversely impacts the Debtor's operation. Many of the Debtor's customers are corporate clients, which call us regularly for their towing needs—but if we are unable to meet those needs, there is a danger that the Debtor will lose its great reputation and its dedicated customer base.

32. Moreover, although the Debtor was current on its payroll obligations on the Petition Date, the Debtor has ongoing payroll obligations that must be met. It relies extensively on its employees to provide services to its customers, and any delay in payment to them would have a catastrophic and irreparable effect on the Debtor's ability to conduct business.

33. As a result, its interim use of Cash Collateral under the Budget is necessary to avoid immediate and irreparable harm to its business, until such time as the Court can schedule a final hearing on the relief requested in this Motion.

B.  <u>Motion for Authority To Pay Critical Vendors</u>.

34. The Debtor has also filed a Motion for Authority To Pay Critical Vendors (the "Critical Vendor Motion"), in which it seeks authority to pay two vendors:

   A.  <u>P-Fleet</u>: This vendor supplies fuel to the Debtor's vehicles, using special fuel cards. The employees are given cards, which they use as needed during the week, and the vendor receives payment the following Monday. The Debtor uses these fuel cards to track its fuel consumption for expense and tax purposes, and to ensure that the employees use the Debtor's fuel properly. On the Petition Date, the Debtor was due for the 4.5 prior weekdays, which could not be calculated with precision as of the execution of this declaration, but is expected to be approximately $1,000.00 (plus any postpetition fuel). The Debtor believes that this vendor will immediately suspend the use of its fuel cards if it does not receive payment the Monday following the Petition Date, which will prevent the Debtor from refueling its vehicles for the week following the Petition Date.

   B.  <u>United Finance/Progressive</u>: This is an insurer that provides truck insurance for the Debtor's vehicles. Truck insurance is critical to protect the bankruptcy estate's assets, as well as to comply with legal requirements. The Debtor believes that this insurer will promptly suspend or terminate coverage if the payment is not made by its due date following the Petition Date. The Debtor

estimates that the prepetition portion of this payment will be approximately $7,000.00.

35. In my opinion, all of the Critical Vendors listed above may need to be paid immediately or else there will be a serious disruption to the Debtor's ability to provide the services that will generate funds in this case. The amounts stated are approximate. It is imperative that the Debtor's operation continue as seamlessly as possible into Chapter 11. The Debtor requires that their services continue uninterrupted, or recommence as soon as possible, during the pendency of this case. If any Critical Vendors are unwilling to provide goods or services postpetition or enter into new or renewed arrangements with the Debtor because of unpaid prepetition claims, then the Debtor's operations will materially suffer, compromising the value of the Debtor's estate to the detriment of all creditors.

36. As described above, I believe the Debtor would suffer immediate and irreparable harm if it is not permitted to pay these two Critical Vendors immediately. The Debtor cannot wait 21 days to purchase its fuel, and there is no reasonable way for the Debtor to locate a suitable replacement vendor within that time. P-Fleet does not merely provide fuel but it also enables the Debtor to track the fuel purchased by its employees at different places throughout different parts of the week. The Debtor cannot give bank cards to its employees, nor can it risk giving them cash or uncontrolled prepaid cards.

37. Similarly, it cannot risk the possibility of cancellation of its vehicle insurance and it does not have the resources to begin searching for a new plan, especially in light of its status as a debtor in this Court. Even a delay of a couple days severely and adversely impacts the Debtor's operation.

C. Motion To Abandon Vehicles.

38. The Debtor has also filed a Motion To Abandon Vehicles, Nunc Pro Tunc to the Petition Date (the "Abandonment Motion"), in which it seeks authority to abandon several vehicles retroactively to the Petition Date.

39. As noted above, the Debtor has only three full-time drivers left for its operations. I believe that it no longer needs a fleet of eleven vehicles and can operate effectively with only three. Therefore, I believe the following vehicles can be abandoned:

| Vehicle | VIN |
|---|---|
| 2016 Dodge Ram 5500 | 3C7WRNBLXGG203409 |
| 2018 Ford Transit Van | NMOLS6E79J1362188 |
| 2021 Dodge Ram | 3C7WRNBL0MG546760 |
| 2018 Ford F550 Flatbed | 1FDUF5GYXJEC96105 |
| 2008 Ford F650 | 3FRWX65F28V640805 |
| 1999 Wrecker | 1HTSCAAMXXH629013 |
| 2022 Freightliner | 1FVACWFC7PHNX2599 |
| 2022 Ford F600[4] | 1FDFF6LT3NDA15573 |
| 2017 International 4300[5] | 1HTMMMML5HH445660 |
| 1999 Dakota[6] | 1B7GG22YXXS229437 |

(the "Abandoned Vehicles"). In my opinion, the Abandoned Vehicles do not have value or benefit to the estate and are in fact burdensome to the estate.

---

[4] This vehicle was physically surrendered before the Petition Date.
[5] The lien on this vehicle is held by First Business Bank.
[6] Newtek is not listed on this title but required to possess the title certificate. The Debtor believes this vehicle has only nominal value at best.

40. While it remains in possession of these additional vehicles, the Debtor must insure them and may be obligated to the secured creditors that assert liens on them. 4 Points Auto and I are storing them voluntarily, but we are under no continuing obligation to do so. The Debtor does not have the resources to sell them at this time and I do not believe that selling them will make a material difference in the claim amounts, which at this point are likely to be unsecured.

41. Except for the 2017 International 4300, upon which First Business Bank asserts a lien, Newtek asserts a lien on the remaining Abandoned Vehicles. As of today, we have contacted the secured creditors, surrendered the vehicles, and asked the secured creditors to pick them up.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: 8/8/25

_Janet Kope_
JANET KOPE